## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No. 24-CR-193** |
| **v.** | |
| **RASHEED MULLINS,** | |
| **Defendant.** | |

### UNITED STATES' MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION

The United States respectfully submits this memorandum in support of its oral motion for detention pending trial under 18 U.S.C. §§ 3142 (d)(1)(A)(i) (on release pending trial) and 3142(f)(1)(A) (crime of violence). The defendant is charged with Assault with Intent to Kill While Armed and Aiding and Abetting (AWIK w/A), in violation of D.C. Code §§ 22-401, 4502, 1805, for the drive-by shooting that took place on April 2, 2024. There is no condition or combination of conditions that will assure the safety of the community. Thus, the government requests that the Court order the defendant detained pending trial. As described below, all four statutory factors in Section 3142(g) strongly favor pretrial detention.

### Factual and Procedural History

On April 2, 2024, Officer Melvin Cruz was in full uniform, operating a marked scout car located in front of 2758 Bruce Place, Southeast, Washington D.C. 20020. Officer Cruz was facing west towards the intersection of Bruce Place and Raynolds Place, Southeast, Washington, D.C.

At approximately 11:25 AM, Officer Cruz saw a black sedan and immediately behind it, a red Kia Borrego SUV stopped in front of 2802 Bruce Place, Southeast, Washington, D.C. 20020. Officer Cruz then saw two individuals wearing dark clothes, one in the rear passenger seat and one in the front passenger seat, hanging out of the vehicle. Simultaneously, Officer Cruz saw gun

smoke and heard multiple sounds of gunshots.

Police officers later canvassed the area for CCTV and found a camera that captured the shooting. Specifically, as shown in the stills below, the footage shows the front passenger of the red SUV (later identified as co-defendant Lover) and the back seat passenger (later identified as co-defendant Warfield) leaning out the window of the red SUV and shooting at a gray Mercedes-Benz sedan. The front seat passenger is shooting a rifle with blue markings and the back seat passenger is wearing blue gloves and shooting a handgun.



*Figure 1: Surveillance Video of Co-Defendants Warfield (rear passenger) and Lover (front passenger) Shooting at complainant.*

The gray Mercedes-Benz sedan was later identified as belonging to the complainant, who explained that he was driving on Morse Road, Southeast, when he noticed the red SUV following his car. When the complainant made a left onto Bruce Place, Southeast from Fort Place, Southeast, the red SUV pulled up beside his driver's side door and began shooting into his vehicle. The complainant's vehicle sustained one bullet hole to his rear windshield window, two bullet holes to his passenger front window, and one bullet hole to his passenger side mirror.

After the shooting, the red SUV then made a right onto the 2300 block of Raynolds Place,

Southeast, Washington D.C., and Officer Cruz followed it. A minute later, at approximately 11:26 AM, Officer Cruz next saw the vehicle resting along the wood line on 22nd Street, having traveled off the street and over the curb. Officer Cruz then immediately chased three individuals on foot after they fled the red SUV. The location of the shooting is indicated in the map below with a red mark and the location of the crash is indicated with a yellow x.



*Figure 2: Map of shooting and red SUV crash.*

In addition to Officer Cruz, two detectives witnessed the three individuals in the red SUV as it crashed. Prince George's County Police Department ("PGPD") Detectives Michael Stargel and Brendan Stokes were in the area for an unrelated matter and were outside of their unmarked surveillance cars in the intersection of Harford Street and Langston Place, Southeast, Washington, D.C., when they heard several gunshots near their location.

Moments after he heard the gunshots, Detective Stargel observed the red SUV come down

Langston Place, Southeast, at a high rate of speed and begin to lose control as it rounded the curve, almost striking Detective Stargel's vehicle. Detective Stargel observed the red SUV start sliding back and forth across Langston Place until it crashed into the wood line on 22nd Street, Southeast, Washington, D.C. Detective Stargel witnessed three people get out of the red SUV. The driver started walking towards 22nd Street until a marked MPD patrol vehicle pulled up, at which point he ran into the woods. Detective Stargel also saw two people get out of the passenger side of red SUV and immediately run into the woods. One of the passengers was holding a blue rifle.

Detective Stokes, who was in the same vehicle as Detective Stargel, witnessed the same. Detective Stargel also noted that the driver was wearing a black puffy coat and both passengers who exited were armed – one of the males from the passenger side was carrying a blue AK-47-style rifle and the second male from the passenger side was manipulating a pistol. Detective Stokes saw all three men run down to the bottom of the ravine near the drainage creek and continue running toward Suitland Parkway. The drainage creek is circled in red in the map below and the location of the detectives' vehicle when they observed the crash and bail out is indicated with a pink x.



*Figure 3: Position of Detective's vehicle and defendant's approximate flight path*

As MPD officers arrived, Detective Stokes directed incoming officers to Suitland Parkway to cut off the three men. Within six minutes of the shooting, all three individuals were apprehended and detained in the woods, as explained below.

After the crash, law enforcement secured the red SUV.   In addition, the complainant was later taken to the crash scene in front of 3010 22nd Street, Southeast, by Detective Jones where the complainant positively identified the red Kia SUV as the vehicle from which the shots came.

Detective Jones contacted Individual 1, the owner of the red SUV, and asked for Individual 1's consent to process the vehicle for evidence. Individual 1 declined Detective Jones' request.

The red SUV was seized as evidence and towed to DFS, where it remains.

<u>*Apprehension and Identification of Mullins, Warfield, and Lover*</u>

At approximately 11:30 AM – *just five minutes after the shooting* – officers surrounded and detained Mullins. While near the crash scene, Detective Stargel saw Mullins being brought out of the woods. At that time, Detective Stargel positively identified Mullins as the driver of the red SUV. Mullins later provided officers his name and date of birth.

Warfield was detained by Officer Joubert Joseph at 11:29 AM. When he was detained – *four minutes after the shooting* – he was wearing blue surgical gloves and a black hoodie consistent with those seen in surveillance video showing the drive-by shooting. S*ee* Figures 4-7 below. However, as captured on body worn camera footage, Warfield can be seen removing those blue gloves and discarding them on the ground as he was detained.   Officers later went back to the scene on April 4, 2024, and retrieved a pair of blue gloves from that area. During a show-up identification procedure at 12:16 PM, Detective Stokes positively identified Warfield as one of the people he saw exit the passenger side of the red SUV. Warfield provided officers his name and date of birth.



*Figure 4: Surveillance Video of Defendants Warfield (rear passenger) and Lover (front passenger) Shooting at complainant.*



*Figures 5, 6, and 7: Defendant Warfield Wearing Blue Surgical Gloves at 11:29 AM When He Was Detained.*



*Figure 8: Defendant Warfield in Black Hoody with Right Side Zipper Pocket in Forward Slanting Direction.*

At 11:31 AM – *just six minutes after the shooting* – Lover, was detained by Officers Brandon Cyrus and Samuel Horst. At 12:21 PM, Detective Stokes positively identified Lover during a show-up identification procedure as one of the people he saw exit the passenger side of the red SUV. In addition, when he was detained, Lover was wearing clothing consistent with what he can be seen wearing in the surveillance footage below -- absent a white hat. (As also explained below however, a white hat was later found in his flight path.)

Detective Stokes said that Lover was the individual armed with a blue AK-47 style rifle. As he did when arrested on December 23, 2023, Lover once again falsely identified himself to law enforcement as Marcus Adams and provided a date of birth of January 27, 1994. After his fingerprints were taken and scanned into the database at the police station, officers learned that his true name was Alonzo Lover (DOB: 1/28/94).

After the defendants were detained, officers canvassed the woods in the suspects' flight

path and found on the ground a black Glock 19 Gen 5 semi-automatic handgun (SN# BKRG362), with no round in the chamber and 11 rounds in a 15-round capacity magazine. The Glock 19 Gen 5 handgun appeared to be fully functional, capable of expelling a projectile by means of an explosive action, had a barrel length of less than 12 inches, and the ability to be fired by the use of a single hand.



*Figure 9: Recovered Glock 19 Gen 5 semi-automatic handgun.*

Officers also found a black semi-automatic Draco Norinco MAK-9 Sporter (SN# #35034) with blue tape wrapped around the barrel, 1 round in the chamber and 17 rounds in an unknown capacity magazine.



*Figure 10: Recovered Draco Norinco MAK-9 Sporter.*

The rifle seen in the CCTV footage (*see* Figure 11 below) appeared to be consistent with the rifle recovered in the woods on April 2, 2024, and is consistent with Detective Stokes' statement that he saw Lover carrying a blue rifle.



*Figure 11: Surveillance Video of Defendants Warfield (rear passenger) and Lover (front passenger) Shooting at complainant.*

While canvassing the scene of the shooting, police found 9 mm and 7.62 x 39 mm shell casings in front of 2806 Bruce Place, Southeast, which were collected as evidence. National Integrated Ballistics Information Network ("NIBIN") results indicated a potential ballistics link between both the recovered Glock 19 handgun and 9 mm casings recovered and the Draco rifle and the 7.62 x 39 mm casings recovered.

On April 4, 2024, officers canvassed the woods a second time and recovered a white baseball cap with the word "Nike" in black lettering. The white baseball cap was also found in the woods along the flight path, as shown below.



***Figure 12: The yellow box represents the <u>approximate</u> area where Defendants Mullins, Warfield, and Lover were detained, as well as where the Glock 19 was recovered. The red box reflects the <u>approximate</u> area where the white cap and Draco rifle were recovered.***

The white cap is consistent with the white baseball cap that Lover is seen wearing in the

CCTV footage of the drive-by shooting (*see* Figures 13 and 14 below).



*Figures 13 and 14: Lover Wearing White Baseball Cap.*



*Figure 15: Baseball Cap Recovered from the Woods Where Lover Was Arrested.*

A search of government records revealed that Mullins, Warfield, or Lover were not licensed to carry a firearm or possess ammunition in the District of Columbia.

Following the defendants' arrest on April 2, 2024, all three defendants were presented to the Honorable Eric Glover in C-10 in D.C. Superior Court. After reviewing the Gerstein submitted in the case, Judge Glover found that there was insufficient probable cause for the charged offenses,

as it related to all three defendants. Judge Glover dismissed the case and released all three defendants.[1]

On April 3, 2024, all three defendants arrived at the MPD station together to collect their property. Accompanying the defendants was Individual 1, the owner of the red SUV. During a conversation with Officer Garcia, Individual 1 gave Officer Garcia her name and phone number, stated that she was Lover's girlfriend, and that she should be the police contact for all three defendants. MPD released the defendants' property to them but did not release the car to Individual 1.

On April 26, 2024, at the defendant's initial appearance, the government orally moved for detention pending trial pursuant to the above-referenced provision of the federal bail statute, and any additional provisions that may apply upon review of the Pretrial Services Agency report ("PSR"). A detention hearing was set for April 30, 2024, at 2:00 PM.

<u>**Legal Authority and Argument**</u>

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination

---

[1] Based on the transcript from the defendants' presentment, it is unclear whether the Court received the filed Supplemental Gerstein, which contained some of the additional facts described herein.

should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *See Smith*, 79 F.3d at 1210; *see also Williams*, 798 F. Supp. at 36.

    **I.**    **The Bail Reform Act Factors All Favor Detention Given Defendant's Risk of Flight and Danger to the Community**

The United States seeks detention pursuant to 18 U.S.C. §§ 3142 (d)(1)(A)(i) (on release pending trial) and 3142(f)(1)(A) (crime of violence), because the defendant is charged with a crime of violence where multiple firearms were used and committed the offense while on pre-trial release.

A review and understanding of the facts and circumstances in this case demonstrate that there are no conditions or combination of conditions that would assure the safety of the community or the defendant's return to Court should he be released. *See* 18 U.S.C. § 3142(e)(1). All four § 3142(g) factors favor detention pending trial, including: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

    **A.**    **The Nature and Circumstances of this Offense Merits Detention.**

The nature of Defendant Mullins' conduct is serious and weighs heavily in favor of pretrial detention in this case. As an initial matter, the defendant was the driver in a drive-by shooting that nearly killed the complainant. The defendants shot numerous rounds into the complainant's car, striking the back windshield, the passenger side window, and the passenger side headrest. *See* Figures 16-18. Had the bullet that struck the passenger side seat, hit two feet to the left, it is more than likely that the complainant would have been struck in the head, causing serious bodily injury

or even death.


*Figure 16: Complainant's Back Windshield.*


*Figure 17: Complainant's Passenger Side Window.*



*Figure 18: Complainant's Passenger Side Headrest.*

Moreover, not only did the defendant along with his co-defendants, commit a drive-by shooting, they did so approximately 500 feet (or approximately a 2-minute walk) from an elementary school – *during school hours on a Tuesday. See* Figure 19.



*Figure 19: Distance Between the Drive-by Shooting and an Elementary School.*

According to the Rocket Rise Academy's website, the school has 658 students, ages 3 to 10 years old, enrolled at the school. *See* Rocket Public Schools, *Rise Academy*, https://www.rocketshipschools.org/schools/rise-academy/ (last visited on April 28, 2024). Two detectives saw the defendant driving recklessly down the street, seconds before he lost control of the car he was driving and crashed it into the woods. The defendants' actions were not only reckless but endangered the lives of small children. Home surveillance video captured a small child holding the hand of an adult crossing the street *less than 30 seconds* before the defendants' committed a drive-by shooting at that very same spot. *See* Figure 20.



*Figure 20: Small Child Holding the Hand of an Adult, Crossing the Street.*

Furthermore, the defendants not only put a little child in danger, but others as well. When Warfield and Lover shot at the complainant's car, Mullins was driving past a black sedan. That black sedan was in between the shooters and the complainant, directly placing the driver in the direct line of fire.



*Figure 21: Black Sedan in the Field of Fire.*

A drive-by shooting where two defendants fire multiple rounds is incredibly reckless. Doing so…during school hours…near where children play…is *very* serious and dangerous and weighs in favor of detention.

### B.   The Weight of the Evidence Against the Defendant is Strong.

The second factor, the weight of the evidence, strongly favors detention. Two CCTV cameras capture the drive-by shooting that occurred at approximately 11:25 a.m. A couple of minutes later, Mullins crashed the SUV he was driving near where two PG County detectives were standing as they were investigating an unrelated case. Both detectives saw all three defendants get out of the crashed SUV, run into the woods adjacent to 22nd Street, and then helped MPD officers arrest the defendants by directing them to the location where the defendants were hiding. With the help of the two PG County detectives, all three defendants were arrested by 11:31 a.m. and immediately taken out of the woods. As Defendant Mullins was brought out of the woods, PG County detective Stargel identified Mullins as the person who was driving the SUV when it crashed.

The weight of the evidence should be considered equally with the other § 3142 factors.

Notably, in *Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 WL 1778194, at *8. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are— in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang*; this factor should be given no less weight than any other factor.

Indeed, "if the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future Court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *Blackson*, 2023 WL 1778194, at *10. This is such a case, and the defendant should be detained pretrial.

### C.    The Defendant's History and Characteristics Merit Detention.

The third factor—the history and characteristics of the defendant—also heavily favors detention as the defendant was on pre-trial release in D.C. Superior Court case 2023 CF2 005805 for illegally possessing a firearm. In that case, the defendant is charged with Carrying a Pistol without a License ("CPWL"), Possession of an Unregistered Firearm, and Unlawful Possession of Ammunition after an MPD officer saw Defendant Mullins with a Glock 26, 9-millimeter semi-automatic firearm tucked into his pocket. According to the Gerstein, the firearm that Defendant

Mullins possessed on August 21, 2023, had an obliterated serial number, a machine gun conversion switch, and 5 rounds in a 15-round magazine. *See* Gov't Ex. 1. The defendant was released August 25, and was instructed not to possess firearms. Yet, despite being under supervision, a trial date set for May 20, 2024, and specifically being instructed not to possess firearms, Defendant Mullins was the driver in a brazen daytime drive-by shooting. *United States v. Munchel*, 991 F.3d 1273, 1281 (D.C. Cir. 2021) (concluding that courts can and should "consider whether it believes the defendant will actually abide by its conditions when making the release determination"); *see, e.g., United States v. Glasgow*, No. 1:20-CR-27-7 (KBJ), 2021 WL 2403136, at *12 (D.D.C. June 11, 2021) ("Because Glasgow has previously disobeyed a court-ordered condition of pre-trial supervision, the Court has little faith that he would not do so again if released pending trial.").

The defendant's participation in such a violent crime despite being on supervision and disregarding the conditions of his release is proof that he will not abide by the conditions set by this Court if he is released. The Court should have no faith that the defendant will refrain from possessing firearms if released, given the fact the defendant has two firearm arrests in less than one year – and was warned against possessing firearms after his first arrest.

### D.    The Defendant Presents a Danger to the Community.

The fourth factor, the nature and seriousness of the danger to any person or the community posed by the defendant's release, similarly weighs heavily in favor of detention. Defendant Mullin's history shows that he is reckless, impulsive, and escalating in his willingness to use violence.

While Defendant Mullins had virtually no criminal history before his firearm arrest in

August of 2023,[2] what is notable is that in eight short months he went from possessing a machine gun with an extended magazine to participating in a drive-by shooting trying to kill someone. His escalating willingness to use violence demonstrates that he poses a danger to the community if he is released.

Moreover, the recklessness and impulsivity with which Defendant Mullins displayed while using violence also weighs in favor of detention. A review of the CCTV footage shows that the defendants committed a drive-by shooting in front of police with pedestrians nearby. Figure 22 is the scene of the drive-by shooting *14 seconds* before the defendants commit the drive-by. In it, you can see Officer Cruz's scout car in the yellow circle, facing the direction of the shooting. Here, two police cars were patrolling the area of the shooting. Yet, despite their presence, the co-defendants still sprayed bullets from the SUV the defendant was driving. The fact that the defendants were willing to engage in such reckless actions near heavy police presence and where hundreds of young children play, demonstrates how dangerous the defendants are to the community.



**Figure 22: Two MPD Cars Patrolling the Area 14 Seconds before Drive-by.**

The defendant's impulsivity and recklessness, when combined with an escalating willingness to use violence is dangerous for the community and weighs in favor of detention. This

---

[2] Defendant Mullins' only other conviction was on March 31, 2016 for Reckless Driving and Operating a Dirt Bike.

factor, along with the other three factors, weighs in favor of the defendant's detention without bond pending trial.

## <u>Conclusion</u>

The government respectfully requests that the Court issue an Order granting its motion that the defendant be held without bond pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:  <u>/s/ *Jared English*</u>
JARED ENGLISH
Assistant United States Attorney
D.C. Bar No. 1023926
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
Telephone: 202-465-0089
Email: Jared.English@usdoj.gov